

U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Sep 20 - 2021**

AT___O'CLOCK___MINUTES
John M. Domurad, Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

L.T AND M.T. by their parent Jeffrey N.
Thomas, JEFFREY N. THOMAS as parent of
L.T and M.T.; T.L., B.L., R.L., A.L. by their
parent Karen LeClair; KAREN LECLAIR as
parent of T.L., B.L., R.L., A.L.; J.S. by his
parent Danielle Schipano; DANIELLE
SCHIPANO as parent of J.S.; B.P by his parent
Andrea Penamora, ANDREA PENAMORA as
parent of B.P.; E.W. by her parent Joseph
Whitehead; and JOSEPH WHITEHEAD as
parent of E.W.

                    Plaintiffs,

vs.

                                 Civil Action No.:   1:21-CV-1034 (LEK/DJS)
                                 **Verified Complaint**

HOWARD A. ZUCKER, in his official
capacity and in his individual capacity,

                    Defendant.

### VERIFIED COMPLAINT

FOR A VERIFIED COMPLAINT, THE PLAINTIFFS ALLEGE:

### INTRODUCTION

1. Scientists today know that with the universally available vaccines and other treatments,

    healthy people under 65 have more than a 99.9 percent chance of surviving Covid-19.

    Currently, with respect to young people, Covid-19 is less dangerous than most flus. Fear is

    now Covid-19's greatest weapon.  This fear has caused governments to impose restrictions

    on people's freedom. One example is mandating masks on children during school.  Masks

    cause physical, psychological, and sociological harm to children.  They suppress necessary

    facial cues that are critical for children to communicate and to comprehend communication.

1

Masks are not very useful in stopping the spread of Covid-19, but they do, however, inhibit and abridge speech.

2. Government is in the business of doing things (whether effective or not) to allay fears. There is always the risk with democratic forces that in their zeal to fight fear, that their edicts can become oppressive.  However, the founders of our republic, having experienced tyranny and quite determined to avoid its curse upon the new nation, passed a bill of rights—a series of counter majoritarian safeguards to keep the people and country free. Wiser still was entrusting the vindication of these rights to judges with life tenure who would be loyal to the constitution and not the politically powerful.

3. So now, a group of children, through their parents, seek help from this Court. In particular, they plead with the Court to enjoin Defendant Zucker, an unelected bureaucratic official, from unilaterally mandating that children wear masks all day in school.  The masks have made the children sick, stunted their intellectual and social growth and most importantly violated their freedom of speech and association. While the virus may no longer be fatal to our health, it poses an existential danger to our liberty.  Therefore, plaintiffs invoke the jurisdiction of this Court and seeks its wisdom, protection, and justice.

## JURISDICTION & VENUE

4. Plaintiffs bring a civil rights action pursuant to 42 U.S.C. § 1983 and § 1988 for deprivations of plaintiffs' rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

5. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1343(a)(3), 1343(a)(4) and by 42 U.S.C. § 1988, which provides for original jurisdiction in the Court of all suits brought pursuant to 42 U.S.C. § 1983.

6.   Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 because the cause of action arises under the Constitution and laws of the United States.

7.   Venue properly lies in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(1&2) because a substantial part of the events giving rise to these claims occurred in this judicial district.

## PARTIES

8.   Defendant Howard Zucker is the Commissioner of the New York State Department of Health with his principal place of business in Albany County, New York.

9.   Zucker is unelected and politically unaccountable to the citizens of New York.

10.  Zucker issued a regulation mandating that primary and secondary school children (i.e., grades k-12) wear masks during school hours with certain limited exceptions for eating and playing wind instruments.

11.  Plaintiffs are parents of children that are subjected to Zucker's mask requirement.

12.  They on behalf of their children bring this suit to seek relief from this mandate because it violates their rights under the First and Fourteenth Amendments.

13.  Jeff Thomas is the parent of L.T. who attends kindergarten at a private religious school in Albany County.

14.  Jeff Thomas is the parent of M.T. who attends second grade at a private religious school in Albany County.

15.  L.T. and M.T. wear a mask during school as mandated by defendant and, as a result, they have had difficulty communicating and receiving communication because of the masks. Moreover, they have suffered from physical symptoms including headaches and psychological effects like anxiety.

16. Karen LeClair is the parent of T. L. who attends tenth grade at a public school in Clinton County.

17. T.L. wears a mask during school as mandated by defendant and, as a result, he has suffered headaches, dizziness and upset stomach.  T.L. has furthermore had difficulty communicating and receiving communication because of the masks.

18. Karen LeClair is the parent of B. L. who attends fifth grade at a public school in Clinton County.

19. B.L. wears a mask during school as mandated by defendant and, as a result, he has suffered gagging, wheezing and anxiety.  B.L. has furthermore had difficulty communicating and receiving communication because of the masks.

20. Karen LeClair is the parent of R. L. who attends third grade at a public school in Clinton County.  R.L. is autistic and has intellectual disability disorder.

21. R.L. wears a mask during school as mandated by defendant and, as a result, he has suffered headaches, dizziness and upset stomach.  R.L. furthermore has had difficulty communicating and receiving communication because of the masks.

22. Karen LeClair is the parent of A. L. who attends kindergarten at a public school in Clinton County. A.L. has been unable to learn by watching lips to see how sounds are formed as well as connecting speech with emotions because masks hide facial expressions.

23. A.L. wears a mask during school as mandated by defendant and, as a result, she has had difficulty communicating and receiving communication because of the masks.

24. Andrea Penamora is the parent of B. P. who attends third grade at a public school in Saratoga County. B.P. has autism spectrum disorder, sensory processing disorder, epilepsy, conductive hearing loss, speech delay, and other learning disabilities.

4

25. Mask wearing creates great difficulty for B.P.  When he and others around him wear masks, he has difficulty communicating and receiving communication because of the masks.

26. The mask mandate in schools has forced B.P. to attend school virtually and he is now separated from classmates and teachers.

27. Danielle Schipano is the parent of J.S. who attends pre-kindergarten at a public school in Hamilton County. J.S. has speech development issues and has suffered greatly because he has been forced to wear a mask.  J.S. has autism spectrum disorder, sensory processing disorder, epilepsy, conductive hearing loss, speech delay, and other learning disabilities.

28. J.S. wears a mask during school as mandated by defendant and, as a result, he has had difficulty communicating and receiving communication because of the masks. In order to develop his speech properly, J.S. needs to visualize and be shown by his teacher how to express letters and sounds.  Masks have prevented this needed visualization and hence development and education; the masks are impairing J.S.'s ability to communicate and receive communications.

29. Joseph Whitehead is the parent of E. W. who attends seventh grade at a public school in Schenectady County.

30. E.W. wears a mask during school as mandated by defendant and, as a result, she has suffered headaches, dizziness and upset stomach.  E.W. has furthermore had difficulty communicating and receiving communication because of the masks.

## FACTS

### A. MASKS INHIBIT FREE SPEECH AND FREE ASSOCIATION.

31. Facial expressions are a form of communication.

32. Face masks suppress and conceal facial expressions.

33. Thus, mandating school children to wear masks in an environment where communication –
both sending and receiving – is an essential part of learning abridges plaintiffs' children's
First Amendment rights.

1. **BEING ABLE TO SEE FACIAL EXPRESSIONS IS NOT MERELY A LUXURY; IT IS A
NECESSITY FOR PROPER AND UNINHIBITED COMMUNICATION.**

34. The allegations in this section are supported by expert testimony who have provided this
information to the plaintiffs' counsel.

35. The experts' declarations will be submitted with the forthcoming motion for a preliminary
injunction.

36. Facial expressions refer to certain movements or conditions of the facial muscles that
facilitate the nonverbal communication of some thought, emotion, or behavior.

37. Facial expression is the main channel a person uses to decode emotional states or reactions
of others to a message, and facial expressions generally mirror the intensity of a person's
thoughts and feelings.

38. Covering the lower half of the face of both teacher and pupil reduces the ability to
communicate.

39. Being able to see facial expressions is not merely a luxury; it is a psychological necessity to
establish healthy emotional growth and development and communication.

40. Indeed, non-verbal communication is a critical way in which children communicate and
learn in school.

41.  Most of communication is nonverbal.

42. This is especially true given a child's more limited vocabulary; thus, making non-verbal
communication all the more vital to children being able to express themselves.

43. The most substantial part of a person's non-verbal communication is expressed through a person's face, including their mouth region.

44. Thus, non-verbal communication and facial expressions in particular are some of the essential means in which children learn.

45. Therefore, without being able to observe the lower half of someone's face (i.e. their teachers and peers) children fail to effectively learn.

46. The plaintiffs' parents have seen this effect on their children.

**2. MASKS PREVENT CHILDREN FROM EFFECTIVE LEARNING.**

47. Moreover, non-verbal communication occurs in a dynamic and synergistic fashion through children observing their teacher's facial expressions, as well as children being able to observe each other's facial expressions.

48. Without this form of communication, children are not only adversely impacted developmentally as they do not "learn" appropriate facial and social cues, but neurophysiologically do not develop the mirror neurons that are essential for empathy and compassion.

49.  In particular, children lose the experience of mimicking expressions, an essential tool of nonverbal communication.

50. This loss has a pronounced detriment upon children.

51. Positive emotions such as laughing and smiling become less recognizable, and negative emotions get amplified as a result.

52. Consequently, bonding between teachers and students suffer.

53. This lack of bonding further inhibits communication between teachers and students, and hence impacts students' ability to learn.

54.   Students refrain from speaking and are slow to learn in such an environment.

55.   Covering the lower half of the face of children in the classroom setting is also damaging from a Social Learning Theory perspective.  In particular, masks damage, inhibit and abridge a child's ability to learn how to effectively communicate.  Given that masks cause this deficit in developing communication skills, ultimately, mask mandates damage, inhibit and abridge the ability of a child to communicate.

56.   To begin with, it is a generally accepted scientific principal that humans are a hard-wired social species reliant on social cues for our optimal social-emotional growth and development.

57.   It is axiomatic that children learn and develop by mimicking adult models (i.e., teachers).

58.   This is an essential tool in learning and developing non-verbal communication.

59.   However, absent those facial cues, a child will be stunted in their ability to recognize smiling and laughter as positive emotions and, as a consequence, negative emotions will be amplified.

60.   Education of children, especially young children, includes learning how to effectively perceive emotions, respond to emotions, and communicate emotions.

61.   Mask wearing significantly inhibits this education because the lower half of the face is covered.

62.   Indeed, positive emotions exhibited by laughing and smiling are less recognizable with mask wearing, as are negative emotions like being angry or sad.

63.   When teaching children how to interpret feelings and emotions, and how to learn empathy and compassion, facial expressions are critical.

64. With a mask however, the child is unable to imitate and match feelings and facial expressions and thus learn them.

65. With children being largely prevented from perceiving these emotions of their peers, as well as their teachers, they do not learn how to respond to emotions, perceive them, or communicate the emotions themselves.

66. The plaintiffs' parents have seen this effect on their children.

   **3.  MASKS ESPECIALLY PREVENT CHILDREN SUFFERING CERTAIN DISABILITIES FROM EFFECTIVE LEARNING.**

67. Nonverbal children on the autism spectrum rely on facial expressions even more than other children.

68. When a child is unable to express themselves verbally, like nonverbal children, they rely on facial expressions and gestures to communicate a want or need.

69. When such a child is wearing a mask, their sole or primary way of communication is stripped from them.

70. They are thus unable to effectively express a mood, a want, or a need to their teacher or to another student.

71. It is paramount to address oral motor, articulation, feeding, auditory, and aural goals with special needs children.

72. These goals are unable to be addressed however with a mask on a child.

73. Some of these special needs children are entitled to PROMPT  (Restructuring Oral Muscular Phonetic Targets) therapy, which includes the child touching their face, lips, cheeks, chin, and nose, in order to assist in placement of articulators for speech sounds.

74. As a result of mask wearing, these children are essentially denied certain highly effective and necessary therapies, like PROMPT therapy.

75.  Indeed, children cannot imitate an oral motor exercise (lingual elevation, for example) with a mask on. This skill could be used for placement or for feeding.  Children who are entitled to feeding therapy are unable to work on lip closure with a mask on.

76.  Masks invariably create a degree of muffled speech.

77.  This impacts the child's ability to hear, especially children who are hearing impaired.

78.  If the child is not receiving clear sounds from the teacher or proper pronunciation and enunciation, the child does not learn how to pronounce or enunciate what the teacher is saying.

79.  The plaintiffs' parents have seen this effect on their children.

**4. MASKS INHIBIT A CHILD'S ABILITY TO EFFECTIVELY COMMUNICATE TO THEIR PEERS OR THEIR TEACHERS WHICH RESULTS IN SERIOUS EMOTIONAL AND SOCIAL PROBLEMS GOING UNDETECTED AND UNADDRESSED.**

80.  Many children, including very young children, are depressed, anxious, and are dealing with difficult home environments, such as neglect and abuse.

81.  With facial expressions being substantially concealed by the masks, the child is not able to effectively communicate to their peers or their teachers what they are feeling.

82.  This only compounds the problem that masks pose to a child's education.

83.  Children present these feelings and emotions to their teachers and peers in substantial part through facial expression (which is even more true with non-verbal children or children who have certain other special needs).

84.  Because half of the child's face is covered by a mask, the child's emotional state is not ascertained by the teacher and a conversation is never had regarding how the child is feeling or what is causing the child to feel that way. As a result, serious problems that are

ailing the child -- like depression, anxiety, child neglect or abuse -- go undetected and unaddressed.

85. The plaintiffs' parents have seen this effect on their children.

**5. MASKS VIRTUALLY ELIMINATE THE ABILITY OF AUTISTIC, SPEAKING IMPAIRED, AND SOCIALLY INTROVERTED CHILDREN TO SPEAK.**

86. Several plaintiff children have disabilities as described previously.

87. Learning and communication coupled with mask wearing is all the more problematic for children who have communication difficulties or social and pragmatic language delays or disorders.

88. With facial movements being so important to communication, some children are discouraged from voluntarily speaking given that the facial movements of their mouth are concealed.

89. This can especially effect children who suffer from autism, speaking or hearing impaired, are soft spoken or have other impairments or insecurities effecting their ability to speak.

90. Not to mention the masks invariably create some degree of muffled speech.

91. For children who suffer from certain disabilities or are naturally quieter or more introverted, this factor can result in discouraging the children from speaking.

92. The plaintiffs' parents have seen this effect on their children.

**6. MASKING CHILDREN INHIBITS HEALTHY BONDING IN SCHOOL, LIMITS THE CHILDREN'S ABILITY TO MAKE FRIENDS AND ABRIDGES THEIR FREEDOM OF ASSOCIATION.**

93. Covering the students' lower half of their faces reduces the students' ability to communicate with one another and to form bonds of friendship.

94.  The lack of non-verbal communication inhibits the ability to establish trust bonds with peers and this in turn inhibits the development of friendship.

95.   This lack of friendship and bonding with friends leads to depression and alienation.

96.   Depression and alienation results in an increased risk of anti-social behaviors, as well as episodes of self-harm and suicidality.

97.   Overall, it is likely that masking exacerbates the chances that a child will experience anxiety and depression, which are already at pandemic levels themselves.

98.   The plaintiffs' parents have seen this effect on their children.

99.   Reading facial cues is evolutionarily hard-wired into our species to determine friend-or-foe as an essential factor in our survival and safety.

100.  Studies have shown the importance of "reading" faces to establish trust.

101.  Face-to-face contact (where faces can be seen) is essential in establishing healthy bonds— both between students and teachers and children and parents.

102.  This lack of bonding hurts the child emotionally and also inhibits open, honest and effective communication between student and teacher.

103.  Absent this bonding, a profile of mistrust and fear is developed.

104.  Studies also suggest that this increases depression and anxiety.

105.  Psychologically, wearing a facemask fundamentally has negative effects on the wearer and the nearby person.

106.  Basic human-to-human connectivity through facial expression is compromised and self-identity is somewhat eliminated.

107.  The mask hides the uniqueness and individuality of the child wearing the facemask and results in the child feeling that their unique identity is being, at least in part, eliminated; this in turn negatively impacts the connectivity the children experience with others, including their peers and teachers.

108.   Social connections and relationships are basic human needs, which are innately inherited in all people.

109.   Reduced human-to-human connections are associated with poor mental and physical health and results in isolation and loneliness, which are considered significant health related risk factors.

110.   The current mental health metrics for our young people are the worst on record and show the highest rates of depression, anxiety and suicide.

111.   These negative mental health outcomes are only augmented by the negative psychological impact of masks.

112.   In the expert opinion of plaintiffs' expert, this psychological and developmental harm is greater than any potential harm that children may experience from Covid as they are not significant vectors of the Covid virus. Thus, when there is mandated mask-wearing for children, the so-called "cure" is worse than the potential harm of Covid.

113.   The plaintiffs' parents have seen this effect on their children.

**7.  FORCING CHILDREN TO WEAR MASKS HAS A PHYSIOLOGIC EFFECT ON THEIR ABILITY TO RECEIVE INFORMATION AND COMMUNICATE.**

114.   Masks reduce the ability to receive information in other ways.

115.   In normal conditions at the sea level, air contains 20.93% $O_2$ and 0.03% $CO_2$, providing partial pressures of 100 mmHg and 40 mmHg for these gases in the arterial blood, respectively.

116.   These gas concentrations are significantly altered when breathing occurs through a facemask.

117.  In mask wearing, trapped air remains between the mouth, nose and the facemask and is thus rebreathed repeatedly in and out of the body, containing low $O_2$ and high $CO_2$ concentrations.

118.  In particular, children who wear masks experience an increase in carbon dioxide ($CO_2$) intake which corresponds to increased $CO_2$ levels in the children's blood.

119.  This condition is called hypercapnia.

120.  Concomitantly, children who wear masks experience a decrease in oxygen ($O_2$) intake which correspondences to decreased $O_2$ levels in the children's blood.

121.  This condition is called hypoxemia.

122.  This effect is greater and occurs more quickly the smaller the child because of the increased ratio of mask dead space to lung volume.

123.  This has significant mental health and brain function side effects.

124.  Raising the $CO_2$ level and lowering the $O_2$ level must obligately activate the hippocampal-amygdala complex.

125.  The activation of the hippocampal-amygdala complex will trigger in some children the fight or flight stress response.

126.  This emergent-threat detection system of the brain restricts memory access, learning association, and depth of thought.

127.   Lessons learned or improperly associated in childhood are not equally learnable later in life with the same stimulation, as they do not occur with the other original stimulations that must be learned with them.

128.  Additionally, prolonged hypercapnia and hypoxia causes depression and anxiety in children.

129. Extended use of respiratory PPE (personal protective equipment) is not indicated without medical supervision.

130. Based on the scientific literature, individuals who are required to wear masks pursuant to a mandate have the known potential to suffer immediate and irreparable injury, loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

131. In sum, masks interfere with the plaintiffs' ability to communicate with teachers and peers and masks interfere with the plaintiffs' ability to receive information from teachers and peers.

132. The plaintiffs' parents have seen this effect on their children.

**B. JUSTIFICATION FOR ABRIDGING PLAINTIFFS' FREE SPEECH AND FREE ASSOCIATION.**

133. Defendant Zucker, an unelected bureaucrat, has issued a regulation mandating that primary and secondary school children (i.e., grades k-12) wear masks during school hours.

134. Pursuant to 10 NYCRR 2.60, Zucker mandated that all students, personnel, teachers, administrators, contractors, and visitors must wear masks at all times indoors, regardless of vaccination status.

135. Zucker needs a compelling reason for suppressing and interfering with plaintiffs' abilities to communicate and receive information. This interest, plaintiffs presume, lies in health consequences and transmission of the Covid-19 virus.

136. Zucker's interest in masking school children rests upon two prongs.

137. First that Covid-19 represents an abnormal and unparalleled threat of death or disability to school aged children; and second that masks are effective at stopping the transmission of Covid-19.

138. Covid-19 does not represent an abnormal and unparalleled threat of death or disability to school aged children.

139. Masks are ineffective at stopping the transmission of Covid-19.

140. This is demonstrated by the action of elected State officials, by Zucker himself and by the scientific facts (as opposed to hype or hysteria).

    **1.  NEW YORK STATE ELECTED OFFICIALS' ACTIONS (AND INACTION) INDICATE THAT THEY NEITHER BELIEVE THAT COVID-19 CURRENTLY REPRESENTS AN EMERGENCY OR ABNORMAL THREAT NOR THAT MASKS ARE AN EFFECTIVE WAY TO STOP THE TRANSMISSION OF COVID-19 SUCH THAT A MASK MANDATE JUSTIFIES AN INFRINGEMENT UPON PLAINTIFFS' FIRST AMENDMENT RIGHTS.**

141. To the contrary, New York's elected officials do not consider the contraction and spread of Covid-19 a crisis.

142. If Covid-19 represented an abnormal and unparalleled threat of death or disability to people in general and to school children in particular, the Governor most certainly would employ her emergency powers.

143. New York's Governor declared an end to the state of emergency on June 25, 2021.

144. There has been no new state of emergency declaration issued by the Governor since June 25, 2021.

145. The New York State Legislature has not passed any law declaring a state of emergency.

146. Therefore, the fair and reasonable inference and one that the Court should adopt is that:

147. If masks were effective at stopping the transmission of the Covid-19 virus, the Governor would, to the extent allowed by law, impose mask mandates.

148. The Governor has not issued any executive order requiring children at school to wear face coverings (i.e., masks).

149.  The New York State Legislature has not passed any law requiring children at school to wear face coverings (i.e., masks).

150. The New York State Legislature has not passed any law directing that any State officer require and mandate school children (while at school) to wear face coverings (i.e., masks).

**2. ZUCKER'S ACTION (AND INACTION) INDICATES THAT HE DOES NOT ACTUALLY BELIEVE THAT COVID-19 CURRENTLY REPRESENTS AN EMERGENCY OR THAT MASKS ARE AN EFFECTIVE WAY TO STOP THE TRANSMISSION OF COVID-19.**

151. Zucker does not believe masks to be significant in stopping the spread of the virus in other similar situations.

152. Zucker has not mandated that people wear masks regardless of vaccination status for in person colleges and university classroom settings.

153. Zucker has not mandated that people wear masks regardless of vaccination status for movie theaters.

154. Zucker has not mandated that people wear masks regardless of vaccination status for in person business meetings.

155. Zucker has not mandated that people wear masks to play sports outside of primary and secondary school sponsored functions.

156. The unelected Zucker has singled out primary and secondary schools for unique and different standards for a mask mandate as compared to other similarly situated people and activities.

157. Yet Zucker still does not require plaintiffs to wear masks when eating, drinking, singing, or playing a wind instrument.

3.  THE SCIENTIFIC FACTS INDICATE THAT COVID-19 CURRENTLY DOES NOT REPRESENT AN EMERGENCY OR ABNORMAL THREAT NOR THAT MASKS ARE AN EFFECTIVE WAY TO STOP THE TRANSMISSION OF COVID-19 SUCH THAT A MASK MANDATE JUSTIFIES AN INFRINGEMENT UPON PLAINTIFFS' FIRST AMENDMENT RIGHTS.

158.  The allegations in this section are supported by expert testimony who have provided this information to the plaintiffs' counsel.

159.  The experts' declarations will be submitted with the forthcoming motion for a preliminary injunction.

160.  The mortality danger from Covid-19 infection varies substantially by age and a few chronic disease indicators.

161.  For a majority of the population, including the vast majority of children and young adults, Covid-19 infection poses less of a mortality risk than seasonal influenza.

162.   The best evidence on the infection fatality rate from SARS-CoV-12 infection (that is, the fraction of infected people who die due to the infection) comes from seroprevalence studies. The definition of seroprevalence of Covid-19 is the fraction of people in a population who have specific antibodies against SARS-CoV-2 in their bloodstream.

163.  Seroprevalence studies provide better evidence on the total number of people who have been infected than do case reports or a positive reverse transcriptase-polymerase chain reaction (RT-PCR) test counts. These both miss infected people who are not identified by the public health authorities or volunteer for RT-PCR testing. Because they ignore unreported cases in the denominator, fatality rate estimates based on case reports or positive test counts are substantially biased upwards.

164.  A study of the seroprevalence of Covid-19 in Geneva, Switzerland (published in *The Lancet*) provides a detailed age breakdown of the infection survival rate in a preprint companion paper 99.9984% for patients 5 to 9 years old; 99.99968% for patients 10 to 19

18

years old; 99.991% for patients 20 to 49 years old; 99.86% for patients 50 to 64 years old; and 94.6% for patients above 65.

165. The CDC estimates that the infection fatality rate for people ages 0-19 years is 0.003%, meaning infected children have a 99.997% survivability rate. The CDC's best estimate of the infection fatality rate for people ages 20-49 years is 0.02%, meaning that young adults have a 99.98% survivability rate. The CDC's best estimate of the infection fatality rate for people age 50-69 years is 0.5%, meaning this age group has a 99.5% survivability rate

166. The above estimates are all drawn from data before widespread vaccination in the U.S. and elsewhere.

167. Covid-19 is not a serious threat to schoolchildren, especially younger children—even if they contract the disease.

168. To begin, Covid-19 is almost never fatal for schoolchildren.

169. Indeed, the CDC estimates that compared to adults 40 to 49 years of age, children 5 to 17 years of age have 160 times lower risk of death from Covid-19 and 27 times lower risk of hospitalization from Covid-19.

170. Fewer than 350 children under 18 have died with a Covid-19 diagnosis code in their medical record.

171. The incidence of school-age children requiring hospitalizations due to Covid-19 are also rare.

172. The Covid-19 infection in children is generally characterized by mild illness. Only a minority of children require hospitalization.

173. The public health agency in the Netherlands similarly concluded that "Worldwide, relatively few children have been reported with Covid-19.  Children become less seriously ill and almost never need to be hospitalized because of [Covid-19]."

174. Moreover, children are inefficient transmitters of Covid-19.

175. The overwhelming weight of scientific data suggests that the risk of transmission of the virus from children aged six and below to older people is negligible and from children between 7 and 12 to older people is small relative to the risk of transmission from people older than 18 to others.

176. In sum, the medical and epidemiological literature has documented conclusively that children face a vanishingly small risk of mortality from Covid-19 infection relative to other risks that children routinely face.

177. Furthermore, the evidence also indicates that – even without masks—children are less efficient at spreading the virus to adults than adults are at spreading the virus to children or each other.

178. There is no high-quality evidence that requiring children to wear masks has any appreciable effect on the likelihood that teachers or other school staff will acquire the Covid-19 virus.

179. On the contrary, empirical evidence from Sweden and elsewhere where masks were not required show that schools are low-risk environments of disease spread.

180. Covid is unlikely to be fatal to teachers who are vaccinated.

181. New York requires teachers to be vaccinated.

182. Vaccinations are highly effective at keeping adults out of the hospital and even better at preventing death. A healthy, fully vaccinated teacher is close to impervious to threats posed

by Covid spread in the classroom.  By now, every teacher in America has been offered the vaccine; many were in the first priority group, even above vulnerable older people.

183. The Covid-19 vaccines approved for use in the U.S. are very effective in substantially reducing the infection fatality rate.  According to the U.S. Centers for Disease Control, the mRNA vaccines were 94% effective against Covid-19 hospitalization for patients 65 and older.

184. In a study of the effectiveness of the vaccine of frontline workers in real-world settings, the mRNA vaccines reduced Covid-19 infections by 90%.

185. Therefore, infection fatality rates provided above are overestimated by at least one order of magnitude.

186. Fully vaccinated, non-elderly teachers in classrooms face a vanishingly small risk of mortality.

**4.   MASKS ARE NOT EFFECTIVE IN PREVENTING THE TRANSMISSION OF COVID-19.**

187. On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic.

188. A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between $0.25\mu$ to $0.5\mu$ in size.

189. Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

190. Because these particles stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

191. Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

192. Exposure to airborne aerosols is a function of two primary parameters: concentration and time.

193. For many reasons, surgical and cloth masks are the least desirable way to protect people from very small airborne aerosols.

194. Moreover, masks are not considered PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134.

195. Surgical and cloth masks do not effectively protect individuals from exposure to very small airborne aerosols.  A device referred to as a respirator is required to provide such protection.

196. Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings do not provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

197. The AIHA, in its September 9, 2020 Guidance Document for Covid-19 noted that the acceptable relative risk reduction methods must be $\geq 90\%$.

198. Surgical and cloth masks were shown to be only 10% and 5% and far below the required 90% level.

199. The effectiveness of ordinary facial coverings falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

200. Most over-the-counter ordinary facial coverings including cloth and disposable surgical masks have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

201. Moreover, Zucker's mandate allows exceptions for mask wearing during the day.

202. Indeed, Zucker's mask mandate provides that the children do not need to wear masks when eating, drinking, singing, or playing a wind instrument.

203. Even short breaks (e.g. to eat) expose individuals to Covid-19 aerosols in indoor spaces.

204. There are much better and more efficient ways to reduce the risk of Covid-19 transmission than wearing masks.

205. From an industrial hygiene (i.e., exposure control) standpoint, much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction) and should be used to minimize exposures as opposed to masks.

206. Mitigation of Covid-19 particles could be immediately achieved by:

    a.  opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),

    b.  setting fresh air dampers to maximum opening on HVAC systems,

    c.  overriding HVAC energy controls,

    d.  increasing the number of times indoor air is recycled,

    e.  installing needlepoint ionization technology to HVAC intake fans, and

f. installing inexpensive ultraviolet germicide devices into HVAC systems.

207. All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures and have been in place for nearly 100 years.

208. The use of cloth facial coverings and surgical masks do not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

209. The FDA determined that the efficacy of face coverings for reducing or preventing infection from SARS-CoV-2 is not established, and that it would be misleading to state that they are effective in preventing or reducing such infection.

210. The first and only randomized, controlled trial evaluating the impact of mask-wearing on the spread of SARS-CoV-2 in six thousand individuals concluded that there was not statistically significant difference among the masked and unmasked controls sufficient to show that masks are effective in reducing or preventing infection from SARS-CoV-2. Henning Bundgaard et al., Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers: A Randomized Controlled Trial: Annals of Internal Medicine: Vol 174, No 3, https://www.acpjournals.org/doi/pdf/10.7326/M20-6817.

**FIRST CAUSE OF ACTION VIOLATION OF THE FIRST AMENDMENT OF PLAINTIFF CHILDREN.**

211. Plaintiffs repeat and reallege each and every preceding paragraph of this complaint as if fully set forth herein.

212. Defendant Zucker by forcing plaintiffs to wear masks during the school day has violated their First Amendment right to freedom of speech and freedom of association.

SECOND CAUSE OF ACTION VIOLATION OF FEDERAL PREEMPTION/SUPREMACY CLAUSE

213.   Plaintiffs repeat and reallege each and every preceding paragraph of this complaint as if fully set forth herein.

214.   Masks are regulated by the FDA when used for a medical purpose such as preventing the spread of communicable disease.

215.   None of the currently available face coverings for Covid-19 (ie. surgical and cloth masks), other than NIOSH- approved N95 particulate filtering facepiece respirators (when used in specific settings), is approved or licensed by the federal government; they are authorized under Emergency Use Authorization ("EUA") only and may not be mandated.

216.   None of the currently available face coverings for Covid-19 (ie. surgical and cloth masks), other than NIOSH- approved N95 particulate filtering facepiece respirators (when used in specific settings), have received final approval from the FDA as having been adequately tested to establish safety or effectiveness.

217.   Rather, surgical and cloth masks are *unapproved products* that have been authorized only for emergency use.

218.   In fact, the FDA defines them as such and has labeled masks as experimental devices requiring, *inter alia*, that the person using the unapproved experimental device be advised of his or her right to refuse administration of the product. *See* 21 U.S.C. § 360bbb-3(e)(1)(A) ("Section 360bbb-3").

219.   Further, the Mask EUA states that the product must not be labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction.

220. The NYSDOH Mask Mandate not only misleads the public by implying that masks can be used for antiviral protection and to stop the spread of COVID-19, but conflicts with the EUA's terms and is preempted under the Supremacy Clause.

221. Scientific consensus on the short-term and long-term medical and psychological impact on the public from large scale forced prolonged use of face coverings does not exist.

222. It is by now well-settled that medical experiments, better known in modern parlance as clinical research, may not be performed on human subjects without the prior, free, and informed consent of the individual.

223. Federal laws and regulations governing the approval and administration of medical products such as vaccines or masks completely preempt any and all contrary or inconsistent laws of the States and/or local governments.

224. The New York State Mask Mandate is patently contrary to United States law, and thus preempted and invalid.

225. Title 21 United States Code, Section 360bbb-3(e)(1)(A)(ii), and regulations and internal protocols of the United States Food and Drug Administration promulgated thereunder, provide in relevant part that all individuals to whom an investigational product is to be administered under an Emergency Use Authorization be informed "of the option to accept or refuse administration of the product. . .."

226. Because the masks in this mandate are investigational product, only permitted for use under an Emergency Use Authorization, the laws and regulations of the United States prohibit state and local governments from requiring them for any person who does not consent to their administration, including plaintiffs.

227. Plaintiffs do not consent to being required to wear masks.

228. Title 21, Part 50 of the Code of Federal Regulations governs the protection of human subjects in the conduct of all clinical investigations regulated by the U.S. Food and Drug Administration.

229. 21 C.F.R. § 50.20 provides that, "[e]xcept as provided in §§ 50.23 and 50.24, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative."

230. Under the EUA, the mask remains in the clinical investigation stage.

231. Accordingly, the New York State Mask Mandate also violates federal law and regulations governing the administration of experimental medicine and is thus preempted.

**THIRD CAUSE OF ACTION OF PARENTS' RIGHT TO MAKE DECISIONS CONCERNING THE CARE, CUSTODY, AND CONTROL OF THEIR CHILDREN**

232. Plaintiffs repeat and reallege each and every preceding paragraph of this complaint as if fully set forth herein.

233. Plaintiff parents' liberty interest in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court. Almost a hundred years ago in *Meyer v. Nebraska,* 262 U.S. 390, 399, 401 (1923), the United States Supreme Court held that the "liberty" protected by the Due Process Clause includes the right of parents "to control the education of their [children]."

234. "[Indeed,] it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000).

235.  Defendant's mask mandate violates plaintiff parents' right to protect their children from an unhealthy, dangerous, ineffective learning environment and forced medical experiments.

**WHEREFORE,** plaintiffs ask this Court (1) to declare defendant's mask mandate unconstitutional; (2) to order defendant to cease and desist from enforcing this mandate; (3) to award each plaintiff $1.00 in nominal damages; (4) to award plaintiffs the cost of prosecuting this action together with attorneys fees pursuant to 42 U.S.C. §1988, and (5) to grant such other and different relief that the Court, in the exercise of its wisdom and discretion, deems just and proper.

Submitted on this 20th day of September 2021,

/s/  Thomas Marcelle
Thomas Marcelle (Bar Roll No. 102117)
*Counsel for Plaintiffs*
61 Devonshire Dr.
Slingerlands, NY 12159
P: (518) 424-9275
Email: tjmarcelle88@gmail.com

/s/ John E. Sweeney
John E. Sweeney (Bar Roll No. 520512)
*Counsel for Plaintiffs*
1 Stratford Drive
Clifton Park, NY 12065
P: 518-281-3994
Email: john@johnsweeney.org

/s/ Adam G. Giangreco
Adam G. Giangreco (Bar Roll No. 517518)
*Counsel for Plaintiffs*
2390 Western Ave.
Guilderland, NY 12084
P: (716) 984-7035
Email:adamgiangreco@protonmail.com

## <u>DECLARATION OF PLAINTIFFS</u>

On this 20th day of September 2021, I, JEFFREY N. THOMAS, pursuant to 28 U.S.C. §1746, declares that he has read the foregoing and the same is true to his own knowledge, except as to allegations based upon scientific knowledge; with respect to scientific knowledge, he relies upon plaintiffs' experts to establish the veracity of the same but has a good faith belief as to their accuracy.

**/s JEFFREY N. THOMAS**

JEFFREY N. THOMAS


On this 20th day of September 2021, I, KAREN LECLAIR, pursuant to 28 U.S.C. §1746, declares that she has read the foregoing and the same is true to her own knowledge, except as to allegations based upon scientific knowledge; with respect to scientific knowledge, she relies upon plaintiffs' experts to establish the veracity of the same, but she has a good faith belief as to their accuracy.

**/s KAREN LECLAIR**

KAREN LECLAIR


On this 20th day of September 2021, I, DANIELLE SCHIPANO, pursuant to 28 U.S.C. §1746, declares that she has read the foregoing and the same is true to her own knowledge, except as to allegations based upon scientific knowledge; with respect to scientific knowledge, she relies upon plaintiffs' experts to establish the veracity of the same, but she has a good faith belief as to their accuracy.

**/S DANIELLE SCHIPANO**

DANIELLE SCHIPANO


On this 20th day of September 2021, I, ANDREA PENAMORA, pursuant to 28 U.S.C. §1746, declares that she has read the foregoing and the same is true to her own knowledge, except as to allegations based upon scientific knowledge; with respect to scientific knowledge, she relies upon plaintiffs' experts to establish the veracity of the same, but she has a good faith belief as to their accuracy.

**/S ANDREA PENAMORA**

ANDREA PENAMORA

On this 20th day of September 2021, I, JOSEPH WHITEHEAD, pursuant to 28 U.S.C. §1746, declares that he has read the foregoing and the same is true to his own knowledge, except as to allegations based upon scientific knowledge; with respect to scientific knowledge, he relies upon plaintiffs' experts to establish the veracity of the same, but he has a good faith belief as to their accuracy.

**/s JOSEPH WHITEHEAD**

JOSEPH WHITEHEAD