**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

L.T AND M.T. by their parent Jeffrey N. Thomas,
JEFFREY N. THOMAS as parent of L.T and M.T.;
T.L., B.L., R.L., A.L. by their parent Karen
LeClair; KAREN LECLAIR as parent of T.L.,
B.L., R.L., A.L.; J.S. by his parent Danielle
Schipano; DANIELLE SCHIPANO as parent of
J.S.; B.P by his parent Andrea Penamora,
ANDREA PENAMORA as parent of B.P.; E.W. by
her parent Joseph Whitehead; and JOSEPH
WHITEHEAD as parent of E.W.

Civil Action No.:  1:21-cv-1034 (LEK/DJS)

Plaintiffs,

vs.

HOWARD A. ZUCKER, in his official capacity
and in his individual capacity,

Defendant.

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
A TEMPORARY RESTRAINING ORDER A PRELIMINARY INJUNCTION**

---

Thomas Marcelle, Esq. (Bar Roll No. 102117)
Email: tjmarcelle88@gmail.com

John E. Sweeney (Bar Roll No. 520512)
Email: john@johnsweeney.org

Adam Giangreco, Esq. (Bar Roll No. 517518)
Email:adamgiangreco@protonmail.com

## <u>TABLE OF CONTENTS</u>

INTRODUCTION…..…...…………………………………………………...……………………1

FACTS……..…...……………………………………………………………………………..2

ARGUMENT…………...………………………………………………………………………2

   I.    The students have suffered a constitutional injury, which constitutes an irreparable harm; therefore, the students are entitled to a preliminary injunction…………...…2

   II.   The mask mandate implicates the students' First Amendment rights……………4

   III.  The appropriate standard by which to evaluate the constitutionality of a content-neutral regulation that imposes an indirect burden on expressive conduct is the intermediate level of scrutiny…………………………………………………...6

   IV.  Intermediate scrutiny applied to Zucker's mask mandate…………………………...6

     A.  Zucker has not proven his mandate furthers an important or substantial governmental interest …………………………………………………………………8

     B.  Zucker has not proven that his mandate does not burden speech any more than is essential to further the claimed governmental interest ………………………..…13

        1.   Scientific facts establish that children are inefficient transmitters of Covid-19…………………………………………………………..……...14

        2.   Masks are ineffective at preventing the transmission of Covid-19; indeed, there exists more effective and proven ways to reduce the spread of Covid-19 that does not interfere with speech ………..………………………………………15

   V.   Since the plaintiffs are likely to succeed on the merits of their claim, the Court need not weigh the balance of the hardships ………………………..…………………...……19

   VI.  The Court should order Zucker to disclose the information upon which he considered and relied to issue the mask mandate …………………………………………………20

CONCLUSION……………..……………………………..…………………………………22

**Introduction**

For the young, COVID-19 is, and has been, a pathogen of fear.  Scientists know this.
Science tells us that the chances of surviving COVID-19, especially with the development of
vaccines and treatments, is over 99 percent (Declaration of Jayanta Bhattacharya at ¶ 16). Among
young people, it is even less dangerous than most flus (Id.) Yet the fear it inspires has been the
catalyst for the imposition of increasingly unjustifiable restrictions on people's freedom,
especially the young. Mandating masks on school children is just the most obvious example.
Masks do not usefully stop the spread of the Covid-19—but they do cause physical,
psychological, and sociological harm to children (Declaration of Nicholas Kardaras; Declaration
of Daniel Stock).  They also suppress necessary facial cues that are critical for children to
communicate and to comprehend communication (Declaration of Lauren Capriola at ¶ 5).  They
stymie development (id.).  And forcing children to wear them inhibits and abridges their speech—
muzzling the voices of the most voiceless among us.

Government is in the business of doing things (whether effective or not) to allay fears. Of
course, there is always the risk with democratic forces that, in their zeal to repel fear, their edicts
can become oppressive or overreaching.  However, the founders of our republic, having endured
tyranny, and quite determined to blot out its curse upon the new nation, passed a Bill of Rights—a
series of counter majoritarian safeguards to keep our people and country free. Wiser still was
entrusting the vindication of these rights to judges with life tenure who would be loyal to the
constitution rather than the politically powerful.

So now, a group of children, through their parents, seek help from this Court. In particular,
they ask the Court to enjoin Defendant Zucker, an unelected bureaucratic official, from
unilaterally mandating them to wear masks all day in school.  The masks have made the children

1

sick, stunted their intellectual and social growth and, most importantly, have violated their freedom of speech and association. While the virus may no longer be fatal to the health of our children, it poses an existential threat to their liberty.  Therefore, plaintiffs, on behalf of their children, invoke the jurisdiction of this Court and seek its wisdom, protection, and justice.

## FACTS

A number of students ("the students") have brought a civil rights action to protect and preserve their First Amendment freedoms.  In particular, they challenge Defendant Zucker's ("Zucker") mandate that they wear masks all day during school.  As they explain, masks cause them difficulty communicating and receiving communication (Cmplt at ¶¶ 9-30).[1]  Plaintiffs have submitted the declarations of Lauren Capriola, M.S., CCC/SLP, TSSLD, a speech pathologist, Daniel W. Stock, M.D., and Nicholas Kardaras, Ph.D. to explain to the Court the science behind the students' experience. These experts explain that being able to see facial expressions is not merely a luxury; it is a necessity for proper and uninhibited communication in order to effectively learn (see Capriola Declaration at ¶¶ 7-23; Kardaras Declaration at ¶¶ 16-26; Stock Declaration at ¶¶ 3-12).  Masks inhibit a child's ability to effectively communicate to their peers or to their teachers which results in serious emotional and social problems going undetected and unaddressed (see Capriola Declaration at Id.; see Kardaras Declaration at Id.)

## ARGUMENT

### I.   The students have suffered a constitutional injury, which constitutes an irreparable harm; therefore, the students are entitled to a preliminary injunction.

Plaintiffs seek a temporary restraining order and a preliminary injunction.  "The same standards used to review a request for a preliminary injunction govern consideration of an

---

[1] Moreover, masks have caused the students to suffer from physical symptoms including headaches, dizziness, breathing problems, and psychological effects like anxiety (Id).

application for a temporary restraining order." *Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F.

Supp. 3d 264, 272 (NDNY 2015).  To obtain a preliminary injunction a party must demonstrate:

(1) that the party will suffer irreparable harm if an injunction is not granted, and (2) either (a) a

likelihood of success on the merits or (b) sufficiently serious questions going to the merits to

make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its

favor.  *Lusk v. Vill. of Cold Spring,* 475 F.3d 480, 485 (2d Cir 2007).

Starting with irreparable injury. As its name suggests, an irreparable injury is suffered when

monetary damages are difficult to ascertain or are inadequate. *Jackson Dairy, Inc. v. H. P. Hood &*

*Sons, Inc.*, 596 F.2d 70, 73 (2d Cir 1979).  Here, the students allege that Zucker has infringed and

abridged their First Amendment rights.  Constitutional injuries generally do not come with damages.

The Supreme Court has made it "clear that the abstract value of a constitutional right may not form

the basis for § 1983 damages." *Memphis. v. Stachura*, 477 U.S. 299, 308 (1986).  Consequently, the

Supreme Court has declared that the "loss of First Amendment freedoms, for even minimal periods

of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Thus, "[v]iolations of the First Amendment are presumed irreparable." *Tunick v. Safir*, 209

F.3d 67, 70 (2d Cir. 2000). Therefore, in cases such as this, when an alleged deprivation of the First

Amendment is involved, no further showing of irreparable injury is necessary.  *Mitchell v. Cuomo*,

748 F.2d 804, 806 (2d Cir. 1984).  Rather, the irreparable injury is presumed and the first prong of

the test for a preliminary injunction is satisfied.  *See, e.g.*, *Bery v. City of New York*, 97 F.3d 689,

693–94 (2d Cir 2009); *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir 1991).  Although the

irreparable injury is presumed for the first prong of the test in an "action [that] alleges the violation

of plaintiff's First Amendment rights… [I]f the movant fails to show a loss of constitutional rights

on  the  second  prong  of  the  preliminary  injunction  standard,  the  presumption  is  extinguished."

3

*Kermani v. New York State Bd. of Elections*, 487 F. Supp. 2d 101, 107 (NDNY 2006).  For the reasons provided below, the students are likely to succeed on the merits of this case and, therefore, should be granted the injunctive relief they seek.

**II. The mask mandate implicates the students' First Amendment rights.**

The essence of school is the exchange of ideas by hearing, seeing, and speaking.  School is an arena of ideas—"the classroom is peculiarly the 'marketplace of ideas,' [and the Supreme Court] ha[s] not hesitated to strike down laws that effectively inhibit the free discussion … ." *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 296 (1984).  Generally, First Amendment cases deal with the rights of speakers.  However, the First Amendment not only guarantees the right to speak, but it also guarantees the right to listen and receive information. *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).  At issue in this case is both the right of the students to speak as well as the right of the students to receive information.

The students contend (supported by expert testimony and commonsense) that the mask mandate suppresses facial expressions and causes speakers to alter their vocal modulations (see Capriola Declaration at ¶¶ 7-23; Kardaras Declaration at ¶¶ 16-26).  The question is whether such things fall under the First Amendment's protective umbrella.  While facial expressions and vocal modulations are not literal speech, the First Amendment protects more than literal speech.  It also protects expressive conduct (like facial expressions) as long as the conduct is "sufficiently imbued with elements of communication … .  In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, … [the issue is] whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

4

Plaintiffs' expert speech pathologist and psychologist confirm that facial expressions made while speaking are inexorably linked to the content and meaning of speech and its message (Kardaras Declaration at ¶ 18; Capriola Declaration at ¶ 11). Masks, these experts conclude, interfere with, inhibit, alter and distort the ability of speakers to properly communicate their message and listeners to properly perceive the message of the speaker (Capriola Declaration at ¶¶ 3, 12, 21; Kardaras Declaration at ¶¶ 19-21).  Moreover, masks obscure the mouth and thereby force the wearer to speak louder and slower to be understood (Capriola Declaration at ¶ 19; Kardaras Declaration at ¶ 20). The tone, velocity and volume of speech are inexorably linked to the meaning of the message (Kardaras Declaration at ¶¶ 11, 20; Capriola Declaration at ¶ 11). Again, masks, interfere, inhibit, alter, and distort the ability of the speaker to properly communicate and listeners to properly perceive and thus receive the message of the speaker (Capriola Declaration at ¶¶ 3, 12, 21; Kardaras Declaration at ¶¶ 19-21).

Consequently, the students are likely to establish that being able to see facial expression and perceive proper tone and volume of speech is not a mere luxury, it is a necessity for proper and uninhibited communication. Therefore, the evidence shows that the mask mandate abridges the children's speech.

This conclusion is also consistent with the case law.  For example, where a court ordered a defendant to have no communication with another person, defendant's facial smirk was deemed sufficient communication to have violated the no communication mandate.  *People v. Serra*, 391 P.3d 1122, 1131 (Colorado 2015); *see also*, *ABC, Inc. v. Stewart*, 360 F.3d 90, 100 (2d Cir 2004) (concluding facial expressions are essential to understanding the meaning of speech).

### III. The appropriate standard by which to evaluate the constitutionality of a content-neutral regulation that imposes an indirect burden on expressive conduct is the intermediate level of scrutiny.

Just because the mask mandate abridges the children's right to speak and to listen does not mean that the mandate violates the First Amendment. The First Amendment is impeccably complex. To begin with, there is a critical distinction between regulations that directly regulate the content and viewpoint of speech and regulations that indirectly burden speech. This latter is the case here. The mask mandate's purpose is to inhibit the transmission of the Covid-19 virus and makes no reference to speech. So, the mandate's burden on speech is incidental to its purpose. In the parlance of the First Amendment, the mask mandate is a content neutral regulation.

The appropriate standard by which to evaluate the constitutionality of a content-neutral regulation that imposes an indirect burden on expressive conduct is the intermediate level of scrutiny. *See, e.g., Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 (1984); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664–65 (1994). The Supreme Court in *United States v. O'Brien*, 391 U.S. 367 (1968) provided the framework for reviewing a viewpoint-neutral regulation that burdens expressive conduct *Clark.*, 468 U.S. at 298; *Tunick*, 209 F.3d 82. Under the *O'Brien* test, a governmental regulation can pass constitutional muster despite its impact upon expressive conduct, if: (1) it is within the constitutional power of the government; (2) it furthers an important governmental interest; (3) the governmental interest is unrelated to the suppression of free speech; and (4) the regulations burden on First Amendment freedoms is no greater than what is essential in furtherance of the government's important interests. *O'Brien*, 391 U.S. at 377.

### IV. Intermediate scrutiny applied to Zucker's mask mandate.

Before turning to the substance of the intermediate scrutiny test, the students make two limited concessions. First, solely for the purpose of presenting this issue via Order to Show Cause

under Local Rule 7, the students concede for the moment that it was within Zucker's constitutional power to issue a mask mandate.[2] Second, the students concede that Zucker's intertest in the mask mandate is unrelated to the suppression of speech.  Thus, the mandate's constitutionality boils down to a two-fold inquiry: (1) does Zucker's mandate further an important governmental interest and (2) is the mandate's burden on First Amendment freedoms no greater than what is essential to further the government's important or substantial interest.

As this Court has noted, intermediate scrutiny "is more than a mere formality." *Robar v. Vill. of Potsdam Bd. of Trustees*, 490 F. Supp. 3d 546, 560–61 (NDNY 2020).  Indeed, "once a governmental regulation is shown to impinge upon basic First Amendment rights, the burden falls on the government to show the validity of its asserted interest and the absence of less intrusive alternatives." *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 658 (1981) (Brennan, J., concurring in part and dissenting in part).

In the early days of the pandemic, before much was known about Covid-19, there was a natural tendency to defer to rather than scrutinize governmental actions that diminished individual liberty.  But New York's former Governor has declared the emergency caused by Covid-19 over and no new emergency has been since declared. Our nation's scientists have developed vaccines and medical treatments that have limited the worst effects of the virus. So, the time has come to return to regular constitutional order— as Justice Gorsuch recently observed: "Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020).

---

[2] Plaintiffs want to emphasize the limited nature of this concession.  In their Complaint, plaintiffs plead that federal law preempts Zucker's ability to issue his mask mandate. Plaintiffs **will** develop and advance this argument for the preliminary injunction, rather than the instant Order to Show Cause, that the regulation is indeed preempted.

The return to constitutional order means Zucker must prove Covid's harm to students. One unelected bureaucrat, in the absence of a state of emergency and without the involvement of any democratic process, cannot impose by fiat a mandate that interferes with 3,000,000 students' ability to communicate and receive communication, without precise medical proof. Rather, the First Amendment requires Zucker to produce actual evidence of his need to interfere with the students' communications. When the Government defends a regulation "as a means to redress … prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured." *Turner*, 512 U.S. at 664. In particular Zucker, "must demonstrate that the recited harms are real, not merely conjectural … ." *Id.* at 664 (citations omitted).

### A. Zucker has not proven his mandate furthers an important or substantial governmental interest.

Conjecture is easy; proof is difficult. At this point, there are three reasons why Zucker cannot prove that his mask mandate for the students during school hours involves an important governmental interest. First, Zucker himself made no particularized finding that in the school setting the harm posed by Covid-19, in light of treatment protocols and vaccinations, represents a harm greater than a severe flu; (2) the inaction of constitutionally elected officials of the State suggests that Covid-19, in light of treatment protocols and vaccinations, no longer poses a substantial or greater risk than the seasonal flu; (3) underinclusiveness of the school masking requirement deteriorates defendant's ability to claim that it represents an important interest; and (4) the scientific facts indicate that Covid-19 currently does not represent an emergency or abnormal threat as to justify a mask mandate that infringes upon the students' First amendment rights.[3]

---

[3] *Turner* is instructive on the burden of proof point. *Turner* dealt with a FCC content neutral regulation that required cable television operators to carry broadcast operators programing. The theory being that broadcast operators with their peculiar local interest would be out of business by cable companies. The

• **First**, Zucker himself made no particularized finding that in the school setting the harm posed by Covid-19, in light of treatment and vaccinations, represents a harm greater than a severe flu.  It must be said, defendant points to the Delta variant to justify his mask mandate.  However, Zucker's justification is devoid of any statistics referencing morbidity or hospitalization rates. Accordingly, Zucker's reference to the existence of the Delta variant, by itself, is insufficient to establish the necessary level of harm to abridge the students' constitutional rights. Nothing in the justification of his mask mandate discusses treatment or vaccinations.  Simply put, Zucker may not merely seize upon the word *Covid* and plaster it to legal papers as a magical incantation that will make the need to prove his case disappear—he needs proof.

• **Second**, Zucker is also faced with the unpleasant fact that he stands alone. The constitutionally elected branches have not considered masking children in school an important or substantial interest as to justify action.  New York's elected officials do not consider the contraction and spread of Covid-19 an emergency.  Indeed, New York's former Governor declared an end to the state of emergency on June 25, 2021 and there has been no new state of emergency declaration issued by the Governor since. If Covid-19 represented an abnormal and unparalleled threat of death or disability to school children in particular, the Governor most certainly would employ her emergency powers—she has not.  Moreover, and more importantly, the New York State Legislature has not passed any law declaring a state of emergency. The New York State Legislature has not passed any law requiring children at school to wear face coverings. The New York State Legislature has not passed any law directing that any State officer require and mandate school children (while at school) to wear face coverings.

---

*Turner* Court concluded that since there was a "paucity of evidence indicating that broadcast television is in jeopardy" the Government failed to meet its burden of showing an important governmental interest.

Our system eschews the taking of power by one unelected bureaucratic official to mask 3,000,000 children to the detriment of their health (Cmplt at ¶¶ 13-30) on his individual assessment. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 585–586, (1952) (concluding that even the Government's belief that its action "was necessary to avert a national catastrophe" could not overcome a lack of congressional authorization). It is up to the Legislature, not the CDC, to decide whether the public interest merits a mask mandate. Therefore, the fair and reasonable inference and one that the Court should adopt is this: If masks were effective at stopping the transmission of the Covid-19 virus, the Governor would, to the extent allowed by law, impose mask mandates–the Governor has not.

• **Third**, underinclusiveness of the school masking requirement subverts defendant's ability to claim that it represents an important interest. One way to determine the level and seriousness of a governmental interest is to examine its underinclusiveness.  A regulation is underinclusive when it regulates less than what would be logical to achieve the intended government end. As the Supreme Court has noted, underinclusive statutes undermine the legitimacy of the government's purported interest. In the [underinclusive] situation, the fact that allegedly harmful conduct falls outside the statute's scope belies a governmental assertion that it has genuinely pursued [its purported] interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 578 (1993). Thus, "[e]xemptions from … [a regulation] may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994). And so it is here.

Zucker's mask mandate is woefully underinclusive if his interest truly is important. Under Zucker's regulations, the same students with other students and/or teachers can sit side by side at

a private seminar, sing side by side at a church, play video games together, cheer together at a small college basketball game and even play basketball together at a private gym without being subjected to Zucker's mask mandate. Indeed, students together or with teachers can have almost unlimited contact if the activities are done at a private residence, a church, an office, a private facility or even a public facility that is not a primary or secondary school, without wearing masks. Indeed, a high school student can attend a class at a local community college (as many students do) without being subjected to the mandate.  Unless activities done in the school setting inexplicably (or magically) makes Covid-19 more transmissible than the same activities done in other places, the mask mandate has to do with other interests (perhaps political) than important public health concerns.

• **Fourth**, the scientific facts indicate that Covid-19 currently does not represent an emergency or abnormal threat justifying a mask mandate that infringes upon plaintiffs' First Amendment rights**.**  Although, the students do not have the burden of proof, because they are seeking relief pending a full hearing, in fairness to Zucker the students will set forth their anticipated rebuttal arguments.  The students offer the expert testimony of Doctor Jayanta Bhattacharya.  Doctor Bhattacharya earned an M.D. and a Ph.D. in economics from Stanford University (Bhattacharya Declaration at ¶ 3). He is the director of the Stanford Center for Demography and Economics of Health and Aging (Id.). Between 1996 and 2021, Dr. Bhattacharya published 151 articles in peer-reviewed journals, including top-ranked peer-reviewed journals in economics, statistics, public health, epidemiology, medicine, and health policy literatures (Id. at ¶ 4).  His full qualifications are part of his declaration that the students have submitted in support of their Order to Show Cause application.

The mortality danger from Covid-19 infection varies substantially by age and a few chronic disease indicators (Id. at ¶ 16). For a majority of the population, including the vast majority of children and young adults, Covid-19 infection poses less of a mortality risk than the seasonal influenza (Id.). The best evidence on the infection fatality rate from SARS-CoV-12 infection (that is, the fraction of infected people who die due to the infection) comes from seroprevalence studies (Id. at ¶ 17). The definition of seroprevalence of Covid-19 is the fraction of people in a population who have specific antibodies against SARS-CoV-2 in their bloodstream (Id.).

Seroprevalence studies provide better evidence on the total number of people who have been infected than do case reports or a positive reverse transcriptase-polymerase chain reaction (RT-PCR) test counts (Id.). These both miss infected people who are not identified by the public health authorities or volunteer for RT-PCR testing (Id.). Because they ignore unreported cases in the denominator, fatality rate estimates based on case reports or positive test counts are substantially biased upwards (Id.). A study of the seroprevalence of Covid-19 in Geneva, Switzerland (published in *The Lancet*) provides a detailed age breakdown of the infection survival rate in a preprint companion paper: 99.9984% for patients 5 to 9 years old; 99.99968% for patients 10 to 19 years old; 99.991% for patients 20 to 49 years old; 99.86% for patients 50 to 64 years old; and 94.6% for patients above 65 (Id. at ¶¶18-19). The CDC estimates that the infection fatality rate for people ages 0-19 years is 0.003%, meaning infected children have a 99.997% survivability rate (Id.). The CDC's best estimate of the infection fatality rate for people ages 20-49 years is 0.02%, meaning that young adults have a 99.98% survivability rate (Id.). The CDC's best estimate of the infection fatality rate for people age 50-69 years is 0.5%, meaning this age group has a 99.5% survivability rate (Id.).

The above estimates are all drawn from data before widespread vaccination in the U.S. and elsewhere (see Id. at ¶¶ 16-19).  Covid-19 is not a serious threat to schoolchildren, especially younger children—even if they contract the disease (Id. at ¶ 21).  To begin, Covid-19 is almost never fatal for schoolchildren (Id.).  Indeed, the CDC estimates that compared to adults 40 to 49 years of age, children 5 to 17 years of age have 160 times lower risk of death from Covid-19 and 27 times lower risk of hospitalization from Covid-19 (Id.). Fewer than 350 children under 18 have died with a Covid-19 diagnosis code in their medical record (Id.). The incidence of school-age children requiring hospitalizations due to Covid-19 is also rare (Id. at ¶ 23).  The Covid-19 infection in children is generally characterized by mild illness (Id.).  Only a tiny minority of children require hospitalization (Id.). The public health agency in the Netherlands similarly concluded that "Worldwide, relatively few children have been reported with Covid-19 (Id.). Children become less seriously ill and almost never need to be hospitalized because of [Covid-19]" (Id.).

Therefore, based upon the forgoing reasons, the students are likely to show that Zucker lacked an important governmental interest in issuing the mask mandate.  Without such an interest, the mask mandate violates the students' First Amendment rights. Consequently, the students ask the Court to issue a temporary restraining order enjoining the implementation of the mask mandate until the Court can hear the parties concerning the issuance of a preliminary injunction.

**B.   Zucker has not proven that his mandate does not burden speech any more than is essential to further the claimed governmental interest.**

If the Court determines that Zucker had a sufficiently important interest in issuing a mask mandate (which it should not), Zucker still needs to prove to the Court that his mandate does not burden speech any more than is essential to the furtherance of that interest. *O'Brien*, 391 U.S.  at 377. Thus, a court may "not simply assume that the ordinance will always advance the asserted

13

state interests sufficiently to justify its abridgment of expressive activity" *Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 496 (1988).  Consequently, Zucker is entitled to no deference when assessing the fit between his purported interests and the means selected to advance them. *See Turner Broad. Sys., Inc. v. FCC (Turner II)*, 520 U.S. 180, 214 (1997). Rather, to prove a law is narrowly tailored, the government must prove that the law "avoid[s] unnecessary abridgement" of constitutional rights. *Colorado Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 641 (1996).

In this case, Zucker must prove that masking children during the school day, only, is "essential" to further his interest to stop the spread of Covid-19. *O'Brien*, 391 U.S. at 377.   To do this, Zucker must offer proof to establish at least two facts. First, as noted, since there is no parallel requirement for adults in similar settings as students and since students can engage in activities outside of the school building without masks but cannot in school, Zucker must prove school children at school represent a higher risk of transmission of Covid-19 than the parallel activities. Second, Zucker must show that masks (as opposed to other mitigation strategies) are essential to stop the spread of Covid-19.  The students, for the purpose of advancing their request for a temporary restraining order, offer proof to cast grave doubt on the ability of Zucker to prove either proposition.

### 1.   Scientific facts establish that children are inefficient transmitters of Covid-19.

Dr. Bhattacharya will opine that children are inefficient transmitters of Covid-19 (Bhattacharya Declaration at ¶¶ 30-43). The overwhelming weight of scientific data suggests that the risk of transmission of the virus from children aged six and below to older people is negligible and from children between 7 and 12 to older people is small relative to the risk of transmission from people older than 18 to others (Id. at ¶ 30).  In sum, the medical and epidemiological

14

literature has documented conclusively that children face a vanishingly small risk of mortality

from Covid-19 infection relative to other risks that children routinely face (Id. at ¶¶ 16-29).

Furthermore, the evidence also indicates that – even without masks—children are less efficient at

spreading the virus to adults than adults are at spreading the virus to children or each other (Id. at

¶¶ 30-43).  There is no high-quality evidence that requiring children to wear masks has any

appreciable effect on the likelihood that teachers or other school staff will acquire the Covid-19

virus (Id. at ¶¶ 42-44).  On the contrary, empirical evidence from Sweden and elsewhere, where

masks were not required, show that schools are low-risk environments of disease spread (Id. at ¶¶

42-43).

Moreover, Covid is unlikely to be fatal to teachers who are vaccinated, and New York

requires teachers to be vaccinated (Id. at ¶ 20). Vaccinations are highly effective at keeping adults

out of the hospital and even better at preventing death (Id.). A healthy, fully vaccinated teacher is

close to impervious to threats posed by Covid spread in the classroom (Id.).  By now, every

teacher in America has been offered the vaccine; many were in the first priority group, even

above vulnerable older people. The Covid-19 vaccines approved for use in the U.S. are very

effective in substantially reducing the infection fatality rate (Id.). Fully vaccinated, non-elderly

teachers in classrooms face a vanishingly small risk of mortality or serious illness (Id.).

### 2. Masks are ineffective at preventing the transmission of Covid-19; indeed, there exists more effective and proven ways to reduce the spread of Covid-19 that does not interfere with speech.

Zucker will be unlikely to prove that masks are effective at preventing the transmission of

Covid-19.  Indeed, there exists more effective and proven ways to reduce the spread of Covid-19

that does not interfere with speech. In support of this proposition, the students offer the expert

testimony of Stephen Petty.

15

Mr. Petty is an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors – including viruses – arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community (Petty Declaration at ¶ 11).  Since 1996, Mr. Petty has owned and operated EES Group, Inc., a forensic engineering and consultancy corporation specializing in health and safety (Id. at ¶ 11). Mr. Petty holds relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), C.S.P. (Certified Safety Professional), and as a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas and West Virginia) (Id. at ¶ 5).  Mr. Petty has served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases (Id. at ¶ 6). Mr. Petty holds nine U.S. patents, most related to heating, ventilation and air conditioning systems (Id. at ¶ 9).

On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic (Id. at ¶ 17). Moreover, a recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25µ to 0.5µ in size (Id. ¶ 20).

These finding are significant. Very small particles do not fall by gravity at the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks. (Id. at 21). Because these particles stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor

(Id. at ¶ 22). Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung (Id. at ¶ 23). This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection (Id.).

Exposure to airborne aerosols is a function of two primary parameters: concentration and time (Id. at ¶ 24). For many reasons, surgical and cloth masks are the least desirable way to protect people from very small airborne aerosols (Id. at ¶ 25). Surgical and cloth masks do not effectively protect individuals from exposure to very small airborne aerosols (Id.). A device referred to as a respirator is required to provide such protection (Id.).

Facial coverings are not comparable to respirators (Id. at ¶ 28). Leakage occurs around the edges of ordinary facial coverings (Id.). Thus, ordinary facial coverings do not provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection (Id. at ¶ 29). The AIHA, in its September 9, 2020 Guidance Document for Covid-19 noted that the acceptable relative risk reduction methods must be >90% (Id. at ¶ 26). Surgical and cloth masks were shown to be only 10% and 5% and far below the required 90% level (Id.).

The effectiveness is further reduced by gaps in the masks (Id. at ¶¶ 32-33). The effectiveness of ordinary facial coverings falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering (Id. at ¶ 34). Most over-the-counter ordinary facial coverings including cloth and disposable surgical masks have edge gaps of 10% or more (Id. at ¶ 33). When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10% (Id.). In short, masks are an ineffective way to stop the transmission of Covid-19 (Id. generally).

There are much better and more efficient ways to reduce the risk of Covid-19 transmission than wearing masks. From an industrial hygiene (i.e., exposure control) standpoint, much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction) and should be used to minimize exposures as opposed to masks (Id. at ¶¶ 36-37). Mitigation of Covid-19 particles could be immediately achieved by:

    a.  opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),

    b.  setting fresh air dampers to maximum opening on HVAC systems,

    c.  overriding HVAC energy controls,

    d.  increasing the number of times indoor air is recycled,

    e.  installing needlepoint ionization technology to HVAC intake fans, and

    f.  installing inexpensive ultraviolet germicide devices into HVAC systems.

(Id.).

All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures and have been in place for nearly 100 years (Id. at ¶ 37). And none of these measures abridge students' right to free speech and association.

Therefore, based upon the forgoing reasons, the students are likely to show that Zucker will be unlikely to prove that the mask mandate for primary and secondary students only during the school day is essential to stopping the spread of Covid-19.  Without such proof, the mask mandate violates the students' First Amendment rights. Consequently, the students ask the Court to issue a temporary restraining order enjoining the implementation of the mask mandate until the Court can hear the parties concerning the issuance of a preliminary injunction.

18

**V.      Since the plaintiffs are likely to succeed on the merits of their claim, the Court need not weigh the balance of the hardships.**

Finally, because Plaintiffs are reasonably likely to be successful on the merits of their First Amendment claim, the Court need not weigh the balance of hardships each party would endure with or without the injunction.  *See Hitchcock v Town of Poestenkill*, 21-cv-798 (FJS/DJS) (NDNY September 22, 2021) citing *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). This is particularly true in the First Amendment case. "[I]n the First Amendment context, ... the likelihood of success on the merits is the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). This is because a plaintiff who has established that a statute likely violates her First Amendment rights almost always faces a weightier burden than a defendant government seeking to enforce an unconstitutional statute.

Further, the State of New York (as opposed to the narrow focus of the head of the Department of Health) has a vested interest in ensuring children are properly educated. "Providing public schools ranks at the very apex of the function of a State." *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). As detailed in the Complaint and expert declarations accompanying this Order to Show Cause, masks hurt plaintiff students' ability to learn (see Kardaras Declaration at ¶¶ 22-23; Capriola Declaration generally; Stock Declaration generally).  Moreover, in this case, plaintiff students face hardships beside the abridgement of their speech. The masks are making them sick and triggering alienation (which dramatically increases the risk of suicide (see **Cmplt** at ¶¶ 9-30; Kardaras Declaration at ¶¶ 8, 9, 25; see Petty Declaration at ¶ 39; Stock Declaration).  Therefore, the balance of hardship tilts greatly in favor of the plaintiffs.

**VI.    The Court should order Zucker to disclose the information upon which he considered and relied to issue the mask mandate.**

Zucker, plaintiffs presume, relied upon some sort of expert proof to establish his mandate. He has the burden of proof and must ultimately come forward with it at a hearing.  Plaintiffs have provided to defendant plaintiffs' experts and much of the substance of their testimony prior to the hearing– defendants who have the burden ought to do the same.

Rule 26(d) of the Federal Rules of Civil Procedure generally provides that formal discovery will not commence until after the parties have conferred as required by Rule 26(f). The Court may, in the exercise of its broad discretion, alter the timing, sequence and volume of discovery. *See, e.g.,* Fed.R.Civ.P. 26(b)(2) and 26(d). "Although such orders are unusual, a court may order expedited discovery where appropriate under a flexible standard of reasonableness and good cause."  *Briggs & Stratton Corp. v. Chongquing Rato Power Co.*, 2013 WL 12134085, at *1 (NDNY 2013). "In deciding whether to grant a party leave to conduct expedited discovery, a court should weigh the need for discovery at an early juncture in the litigation against the breadth of the discovery requests and the prejudice to the responding party, by considering such factors as (1) the timing and context of the discovery requests, including whether a preliminary injunction hearing has been scheduled; (2) the scope and purpose of the requests; and (3) the nature of the burden to the respondent." *Id*.

All the factors favor disclosure of the expert evidence upon which Zucker considered and relied to issue the mandate. This case, furthermore, involves a claim of irreparable harm and so disclosure is favored.  "The good cause standard [for disclosure] may be satisfied where a party seeks a preliminary injunction. *Qwest Commc'ns Int'l, Inc. v. WorldQuest Networks, Inc.,* 213 F.R.D. 418, 419 (D. Colo. 2003); see also Fed. R. Civ. P. 26(d) advisory committee notes to 1993 Amendments.

Further, the burden on Zucker to provide his disclosure is small. Zucker possessed all of the materials concerning the evidence upon which he relied on to issue the mandate.  Plaintiffs ought not be left to guess the why and how of Zucker's decision. Plaintiffs have disclosed its experts and the nature of their testimony to Zucker.  Reciprocity therefore seems fair. Both parties should be able to properly prepare for a hearing—it will assist the Court in its determination and will help prevent delay and interruption to the hearing. Moreover, Zucker's mandate is recent; meaning the evidence that plaintiffs seeks is not stale.  In addition, as a governmental agency, Zucker is required to keep such information in the event he is called upon by the Governor, the Legislature or the public (via a FOIL request) to explain why he issued the mandate.  Thus, Zucker will have little or no extra costs in producing the disclosures demanded by plaintiffs.

Therefore, plaintiffs request that defendant provide them the following information:

> (1) All studies, opinions, papers, data, and statistics relied upon by Defendant in his attempt to ascertain the harm and risk of Covid-19 (and all of its variants) to children under 18 years of age;

> (2) All studies, opinions, papers, data, and statistics that were rejected by Defendant in his attempt to ascertain the harm and risk of Covid-19 (and all of its variants) to children under 18 years of age;

> (3) All studies, opinions, papers, data, and statistics relied upon by Defendant in his attempt to ascertain that masks worn by children under 18 years of age are an effective barrier to the transmission of Covid-19 (and of all its variants) in schools and in general;

> (4) All studies, opinions, papers, data, and statistics that were rejected by Defendant in his attempt to ascertain that masks worn by children under 18 years of age are an effective barrier to the transmission of Covid-19 (and of all its variants) in schools and in general;

> (5) All studies, opinions, papers, data, and statistics relied upon by Defendant in his attempt to ascertain that schools are a place of significant transmission of Covid-19 (and of all its variants);

(6) All studies, opinions, papers, data, and statistics that were rejected by Defendant in his attempt to ascertain that schools are a place of significant transmission of Covid-19 (and of all its variants);

(7) All studies, opinions, papers, data, and statistics relied upon by Defendant in his attempt to ascertain that children under 18 years of age are significant or substantial transmitters of Covid-19 (and of all its variants);

(8) All studies, opinions, papers, data, and statistics that were rejected by Defendant in his attempt to ascertain that children under 18 years of age are significant or substantial transmitters of Covid-19 (and of all its variants).

(9) All studies, opinions, papers, data, and statistics that were reviewed, considered or analyzed by Defendant that in any way pertained to the efficacy or inefficacy of wearing masks in inhibiting or preventing the transmission of a virus, including, but not limited to, Covid-19.

Plaintiffs further request that the Court order that Defendant shall clearly indicate which studies, opinions, papers, data, and statistics apply to which of the nine disclosures ordered by the Court; and that defendant provide the name of the person(s) who reviewed such studies, opinions, papers, data, and statistics to determine and/or recommend and/or reject the reliability of such studies, opinions, papers, data, and/or statistics.

### Conclusion

The lower half of the face is critical for the conveyance of both non-verbal and verbal communication.  A government mandate (by a single unelected bureaucrat no less) that requires the lower half of the face to be obscured and obstructed by a mask, necessarily implicates the free speech clause of the First Amendment.  In order for Zucker's mask requirement to stand, therefore, he must show the validity of his asserted interest and the absence of less intrusive alternatives, and he must do so with actual proof.  Zucker does not have proof that Covid-19 disproportionately or significantly harms children.  Zucker does not have proof that masks operate to reduce the spread of Covid-19.  Quite the contrary, according to plaintiffs' experts.  Indeed, rather than protecting students, the masks are harming them—all day, every day mask wearing is

22

harming the students' ability to learn in school; harming the students' mental health; and harming

the children's physical health.  The plaintiff students therefore plead with this Court to restrain

Zucker and stay his mask mandate.

Dated: September 27, 2021

/s/_Thomas Marcelle
Thomas Marcelle (Bar Roll No. 102117)
*Counsel for Plaintiffs*
61 Devonshire Dr.
Slingerlands, NY 12159
P: (518) 424-9275
Email: tjmarcelle88@gmail.com

/s/ John E. Sweeney
John E. Sweeney (Bar Roll No. 520512)
*Counsel for Plaintiffs*
1 Stratford Drive
Clifton Park, NY 12065
P: 518-281-3994
Email: john@johnsweeney.org

/s/ Adam G. Giangreco
Adam G. Giangreco (Bar Roll No. 517518)
*Counsel for Plaintiffs*
2390 Western Ave.
Guilderland, NY 12084
P: (716) 984-7035
Email:adamgiangreco@protonmail.com